# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 18-1921V
Filed: January 25, 2021
PUBLISHED

| | |
|---|---|
| MARYLYN LAVENDER,<br><br>　　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　　Respondent. | Special Master Horner<br><br><br><br>Finding of Fact; Shoulder Injury<br>Related to Vaccine<br>Administration; SIRVA;<br>Influenza (flu) Vaccine; Onset |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*James Vincent Lopez, U.S. Department of Justice, Washington, DC, for respondent.*

## **FINDING OF FACT**[1]

On December 14, 2018, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012)[2], primarily alleging that as a result of an influenza ("flu") vaccination that she received on September 16, 2016, she suffered a Table Injury of Shoulder Injury Related to Vaccine Administration ("SIRVA") but also alternatively that she suffered a shoulder injury caused-in-fact by her vaccination. Respondent recommended that compensation be denied, arguing, *inter alia*, that there is not preponderant evidence that petitioner's shoulder pain began within a timeframe that would support a finding of vaccine causation, namely 48 hours for a SIRVA.

For the reasons described below, I now issue the below finding of fact. I conclude that there is not preponderant evidence that petitioner experienced onset of

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

shoulder pain within 48 hours of receiving her vaccination. Further, I find that the evidence preponderates in favor of a finding that onset of petitioner's shoulder pain was gradual and began no earlier than two weeks post-vaccination.

## I.        Procedural History

As noted above, petitioner initiated this claim in December of 2018. (ECF No. 1.) At that time, it was assigned to the Special Processing Unit ("SPU") based on the allegations in the petition. (ECF No. 5.) Petitioner completed the filing of her medical records (Ex. 1-5), an affidavit (Ex. 6), and a further record of her vaccination (Ex. 7), then filed her Statement of Completion on June 21, 2019. (ECF No. 10.) Respondent subsequently filed his Rule 4(c) Report on January 2, 2020. (ECF No. 16.) Respondent recommended against compensation, noting that "there is no reliable, persuasive evidence that petitioner has an onset of SIRVA symptoms within 48 hours of vaccination." (ECF No. 16, p. 5.) The case was subsequently removed from SPU and reassigned to me. (ECF No. 18.)

On January 16, 2020, I issued an Order to Show Cause why the case should not be dismissed. (ECF No. 19.) I explained that petitioner's contemporaneous medical records not only failed to support her claim of a Table SIRVA, they were inconsistent with it. (*Id.* at 1.) I advised that to avoid dismissal, petitioner would need to either provide an offer of proof that persuasive evidence would be forthcoming to overcome the contemporaneous medical records or allege a different injury. (*Id.* at 2.) Petitioner subsequently filed additional records (Exs. 8, 12), a further affidavit of her own (Ex. 10), and witness affidavits by three other witnesses, Leah Phipps (Ex. 9), Tracy Palmer (Ex. 11), and Danielle Ellis (Ex. 13). (ECF Nos. 22-25.)

On June 16, 2020, I held a follow up status conference. (ECF No. 26.) I advised that I remained concerned regarding the presumption that contemporaneous medical records are believed to be complete and accurate. I suggested that parties depose petitioner's primary care physician, Dr. McCutcheon, whose notations were at issue. (*Id.*) The parties conducted that deposition on November 10, 2020 and filed the transcript on November 23, 2020 (Ex. 14). (ECF No. 30.)

Thereafter, I ordered petitioner to confirm whether she wished to file any further evidence before closing the record in anticipation of a finding of fact regarding onset of her alleged injury. (Scheduling Order (Non-PDF), 11/23/2020.) On November 25, 2020, petitioner confirmed that she had no further evidence to file. (ECF No. 31.) Thereafter, I advised that I would issue a finding of fact as to onset and the parties filed simultaneous briefs in support of their respective positions on January 8, 2021. (Scheduling Order (Non-PDF, 11/25/2020; ECF Nos. 33-34.) No responsive briefs were filed. Accordingly, this case is now ripe for a finding of fact resolving the onset of petitioner's alleged shoulder pain.

II. **Factual History**

a. **Medical Records**

Petitioner received the flu vaccine forming the basis of this claim on September 16, 2016. (Ex. 7, p. 3.) She received her vaccination intramuscularly in her left deltoid. (*Id.*) There is no dispute that petitioner had no prior history of shoulder pain or dysfunction. (ECF No. 16, p. 1.)

Five days later, on September 21, 2016, petitioner presented to her primary care physician, Dr. McCutcheon, for a routine follow up for management of hyperthyroidism, hypertension, and trigeminal neuralgia. (Ex. 2, pp. 20-21.) Petitioner did not report any concerns regarding her recent vaccination or any shoulder pain. The review of systems indicated petitioner had no back pain, no neck pain, no joint stiffness, no muscle aches, and no painful joints. (*Id.* at 20.) However, Dr. McCutcheon did conduct a musculoskeletal examination of petitioner's knees. (*Id.* at 21.)

Petitioner did not return for any further care from any provider until November 30, 2016. At that time, she returned to Dr. McCutcheon with a chief complaint of "shoulder pain." (Ex. 2, pp. 18-19.) The history of present illness indicates that petitioner was suffering left shoulder pain with no known injury. She had full range of motion, but with discomfort. Specifically, she reported that her pain was dull at rest, but worse lifting her arm, with overhead activities, or getting out of a chair. She denied any numbness or tingling and had been treating with Tylenol. Petitioner described her pain as "a nagging pain with a burning sensation in her upper arm." Significantly, Dr. McCutcheon also recorded the following with regard to onset: "[Patient] reports today her left shoulder started hurting a couple weeks after she received the flu shot on 9/16/16." (Ex. 2, p. 18.)

On physical examination, Dr. McCutcheon determined petitioner's cervical spine was normal. (Ex. 2, p. 19.) She noted the absence of impingement, but indicated that petitioner was positive for tenderness to palpation over the acromioclavicular joint and bursa. She had no deltoid tenderness, but did have increased pain with internal and external rotation. (*Id.*) Dr. McCutcheon ordered x-rays which she interpreted as showing mild degenerative changes. (*Id.*) When petitioner presented for her x-ray exam on the same date, she provided a history of "[l]eft shoulder pain x 2 months, no known injury."[3] (*Id.* at 43.) Dr. McCutcheon's assessment was shoulder pain (primary), primary osteoarthritis of the left shoulder, and bursitis. She prescribed Voltran gel. (*Id.* at 19.)

Two weeks later, petitioner sought care from an orthopedist, Dr. Blair, on December 14, 2016, on a self-referral basis. (Ex. 3, pp. 1-5.) Dr. Blair recorded a history of present illness that indicated petitioner was experiencing mild left shoulder pain that occurred occasional and was fluctuating. She described her pain as "aching, burning, dull, piercing, sharp, and throbbing." (*Id.* at 2.) As she indicated her pain was

---

[3] Two months prior to petitioner's November 30, 2016 appointment would have been the end of September 2016. Accordingly, this notation is consistent with Dr. McCutcheon's notation that onset was two weeks post-vaccination.

3

aggravated by lifting or movement. Petitioner did not associate her pain to her vaccination or describe any specific period of onset. Onset of her condition was recorded only as "gradual." (*Id.*) In addition to physical examination, Dr. Blair ordered further x-rays which again showed degenerative joint disease of the acromioclavicular joint as well as reactive changes of the greater tuberosity. (*Id.* at 1.) Dr. Blair's impression was pain in the left shoulder and bursitis of the left shoulder. (*Id.*) He administered a therapeutic injection into the subacromial space and recommended a home exercise plan. (*Id.*)

Petitioner returned to Dr. McCutcheon on January 12, 2017, with a chief complaint of heart palpitations. (Ex. 2, pp. 15-16.) Her shoulder pain was not addressed. However, on March 9, 2017, petitioner returned to Dr. Blair. (Ex. 3, pp. 6-8.) Petitioner reportedly experienced about two months of pain relief from her therapeutic injection, but by the time of this appointment the pain had returned. (*Id.* at 6.) Dr. Blair noted that petitioner had now had pain for over six months,[4] but onset was not otherwise discussed. (*Id.*) Dr. Blair's records indicate the date of petitioner's first orthopedic appointment as the date of onset of her condition. (*Id.*) His impression remained unchanged and he recommended an MRI along with continuation of the home exercise plan. (*Id.*) On April 5, 2017, petitioner returned to Dr. Blair for her MRI results. (*Id.* at 9-11.) Onset of petitioner's shoulder pain was not discussed, but Dr. Blair added a rotator cuff tear to his assessment. (*Id.* at 9.) Her MRI showed mild tendinosis of the supraspinatus tendon, a partial tear at the humeral insertion, and fluid within the acromioclavicular joint with adjacent soft tissue edema. (Ex. 8, p. 30.) This was interpreted as raising suspicion for inflammatory acromioclavicular arthritis.[5] (*Id.*)

On April 24, 2017, petitioner again returned to Dr. McCutcheon for routine follow up without any mention of her shoulder condition. (Ex. 2, p. 11-13.) She did not seek any further care from any provider until autumn. On October 26, 2017, petitioner returned to her primary care provider and saw nurse practitioner Edwards for a six month follow up and lab work. (Ex. 2, pp. 8-10.) Her shoulder condition was not addressed and no further primary care records were filed.

Petitioner returned to Dr. Blair on November 15, 2017. (Ex. 3, pp. 12-15.) Onset of petitioner's condition was not discussed, but Dr. Blair's impression was changed to reflect primary osteoarthritis of the left shoulder. (*Id.* at 12.) He recommended physical therapy which she began on November 24, 2017. (Ex. 3, p. 12; Ex. 4, p. 11.) On her handwritten physical therapy intake form, petitioner indicated that her symptoms began on "9-16-16" and "after a flu vaccine." (Ex. 4, p. 6.) Under case history, the physical therapist indicated petitioner had a one-year history of left shoulder pain.[6] (*Id.* at 11.)

---

[4] This would place onset of petitioner's shoulder pain *prior to* her September 16, 2016 flu vaccination.

[5] Unlike petitioner's prior x-ray report, the history contained in the MRI report does not discuss onset. (Ex. 8, pp. 30.)

[6] This would place onset around the time of petitioner's November 30, 2016 appointment with Dr. McCutcheon rather than around the time of her September 16, 2016 vaccination.

4

Petitioner's physical therapy continued until her discharge on January 18, 2018; however, the initial onset of her shoulder pain was not further discussed. (Exs. 4, 5.)

Petitioner returned to Dr. Blair on January 31, 2018. (Ex. 3, pp. 18-21.) Petitioner noted that her physical therapy had helped improve her symptoms. (*Id.* at 18.) Dr. Blair's assessment remained pain in the left shoulder, bursitis of the left shoulder, and primary osteoarthritis of the left shoulder. (*Id.*) Continued conservative treatment, including home exercise, was discussed. (*Id.*) The initial onset of her injury was not discussed. Petitioner was released to follow up as needed and no further records were filed.

### b. Affidavits

The record of this case contains five affidavits. Petitioner signed two affidavits, one in August of 2018 and one in March of 2020. Only the March of 2020 affidavit contains any narrative detail. The three additional witness affidavits were all completed in March of 2020. For purposes of this finding of fact I assume the affidavits reflect honest recollections; however, in weighing the evidence of record I take note of the fact that these recollections have been memorialized approximately three and a half years after the events at issue.

#### i. Petitioner

In her initial affidavit petitioner indicated that "[i]mmediately following the flu vaccine, I began experiencing pain in the left shoulder." (Ex. 6.) However, she did not otherwise explain the circumstances of her medical history. After prompting by the above-discussed Order to Show Cause, petitioner filed a more detailed affidavit. (Ex. 10.)

In her second affidavit, petitioner indicated that the flu vaccine at issue in this case was her first flu vaccine. (Ex. 10, p. 1.) She described the injection as a painful "stab" and noted that she flinched. (*Id.*) She described an "instant" burning pain at the injection site. She was advised, by both the pharmacist and a pamphlet, to expect soreness and discomfort for a few days. (*Id.*)

Petitioner indicated that her pain worsened over the course of six days. (*Id.* at 2.) She states: "I recall for a fact that when I received the flu shot that's when the pain started, first in the arm at the injection site and then I felt it all over my left shoulder area. The pain was a dull pain at the injection site but as it progressed it became more of a sharp pain. It was not getting better." (*Id.*)

With regard to her September 21, 2016, appointment with Dr. McCutcheon, petitioner indicates that "I saw no reason to mention it because I was told to expect pain at the injection site. I didn't think I needed to complain about a shot five days later when I was told to expect pain and discomfort for a few days." (*Id.*) Petitioner indicates that it

5

was not until after a week passed that she began to question why the pain was not resolving and asking people if they were familiar with this issue. (*Id.*)

With regard to her November 30, 2016 appointment with Dr. McCutcheon, petitioner states:

> I saw Dr. McCutcheon and I did not tell her my "left shoulder started hurting a couple of weeks after" my vaccine, I told her I had a flu shot that hurt my arm, that my shoulder was hurting, and that it kept getting worse. I didn't discuss it much with Dr. McCutcheon because she blew me off when I asked if it was possible to be hurt by the flu shot. She said, "no way." She was not supportive at all and did not believe it was possible. So, I dropped it. This is the same doctor that I was scheduled to see a few days after my husband died, told her and she offered no comfort whatsoever. She was all business. It's because of this unsympathetic attitude that she is no longer my doctor.

(*Id.*)

With regard to her December 14, 2016 orthopedic appointment with Dr. Blair, petitioner disputes that the onset of her shoulder pain was gradual; however, she did not dispute that she described her pain to Dr. Blair as gradual. (*Id.* at 3.) Rather, she indicated that she does not recall using that word. (*Id.*)

Petitioner averred that she never had any prior problems with her left shoulder. (*Id.*) Apart from the above-discussed records, she suggests that her medical records otherwise reflect that onset of her pain was immediate. (*Id.*)

### ii. Leah Phipps

Ms. Phillips indicates that she has known petitioner for 20 years and vouches for her honesty. (Ex. 9.) She does not indicate her exact relationship with petitioner but does indicate that they work together in a bible study group. (*Id.*) Ms. Phillips relays in some detail a conversation with petitioner in which petitioner indicated she was experiencing significant post-vaccination shoulder pain. (*Id.*) However, Ms. Phillips cannot recall whether she spoke to petitioner on the day of her vaccination, cannot recall the date of petitioner's vaccination, and is no more specific than to say that their interaction occurred after "the following few days." (*Id.*) Ms. Phillips does believe this occurred in the autumn, because she was married in mid-December of 2016 and she did not see petitioner often after that. (*Id.*)

### iii. Tracy Palmer

Ms. Palmer indicates that she was a student in a bible study group for which petitioner was the instructor. (Ex. 11.) According to Ms. Palmer, the bible study group met on Friday. She recalled that during one meeting in September petitioner indicated

6

she would be going to get her flu shot that day. (*Id*.) Ms. Palmer did not see petitioner again until one week later when the group met again. (*Id*.) At that point and going forward, petitioner complained of shoulder pain she attributed to her vaccination. (*Id*.)

### iv. Danielle Ellis

Like Ms. Phillips, Ms. Ellis indicates that she has worked with petitioner in their shared ministry. (Ex. 13.) Like Ms. Palmer, Ms. Ellis recalls petitioner telling her that she was experiencing shoulder pain related to her vaccination about one week following her vaccination. (*Id*.) Unlike Ms. Palmer, Ms. Ellis recalls that as a result of their bible instruction she typically sees petitioner about 3-4 times per week during September. (*Id*.)

### c. Dr. McCutcheon's Deposition

Dr. McCutcheon describes her practice at the time of petitioner's vaccination as a family care practice in which she saw approximately 20-25 patients a day. Dr. McCutcheon has 25 years of experience as a general practitioner. (Ex. 14, p. 7, 32-33.) According to Dr. McCutcheon, it is common for patients to be seen with multiple complaints and nothing prevents a patient with her practice from raising additional complaints during their appointments. (*Id*. at 17.) Dr. McCutcheon has treated petitioner for a number of conditions, including hypertension, hyperparathyroidism, knee and shin pain, and neuralgia. (*Id*. at 35-36.) Dr. McCutcheon felt she had a good doctor-patient relationship with petitioner and that they communicated effectively. (*Id*. at 36.)

Unsurprisingly Dr. McCutcheon did not have a specific recollection of her encounters with petitioner. (*Id*. at 17-18, 24-26.) Her testimony was based upon her review of her medical record. (*Id*. at 26.) Dr. McCutcheon confirmed that she reviewed petitioner's medical records prior to her deposition and found nothing she felt was incomplete or inaccurate. (*Id*. at 34.) Dr. McCutcheon explained that the "review of systems" section is completed by patient "bubble sheet" questionnaire[7] and the "chief complaint" section of the record is completed by a nurse, but that she herself completes the "history of present illness" with the patient. (*Id*. at 8-10, 40-41.)

Dr. McCutcheon explained that her usual practice is to record her notes into the electronic system in real-time while the patient is speaking. (*Id*. at 10-11.) Notes from prior visits may be copied and pasted when there are ongoing complaints; however, these notes are updated during the visit. (*Id*. at 9-10.) If a follow up procedure is indicated, the chart may not be closed until the end of the day, but typically Dr. McCutcheon finishes her notes and closes each patient's chart before moving on to her next patient. (*Id*. at 10.) Based on the time stamps of the electronic signatures for the records of petitioner's September 21 and November 30, 2016 encounters, Dr.

---

[7] In fact, there was an earlier period during which the review of systems was completed by Dr. McCutcheon with the patient. (*Id*. at 42-43.) Dr. McCutcheon was "pretty sure" the questionnaire was in use by September 21, 2016. (*Id*.) Once the sheet is scanned and the review of systems populated within the computer, Dr. McCutcheon believes the paper sheets are not retained. (*Id*. at 56-58.)

McCutcheon testified that she likely completed her notations and closed petitioner's chart at the time of petitioner's appointment and before moving to the next patient. (*Id.* at 47-48, 51-52.)

During the deposition, petitioner's counsel sought to press Dr. McCutcheon regarding the frequency with which she is alerted to mistakes in her patient files. (*Id.* at 11-15.) According to Dr. McCutcheon, in her 25 years of practice there have been two or three instances in which a stray diagnosis has been found to have been erroneously included in a patient's file.[8] (*Id.* at 13.) Dr. McCutcheon testified that she checks her record after every visit to make sure it is accurate. (*Id.* at 26.)

With regard to petitioner's September 21, 2016 appointment, Dr. McCutcheon confirmed that she does not have any reason to believe the record of that encounter is not complete and accurate. (*Id.* at 37.) Dr. McCutcheon confirmed that the history of present illness is related to hypertension and neuralgia. (*Id.*) She also indicated, however, that her routine practice in taking a history of illness is to ask whether there has been any change in the patient's condition and whether there are any new complaints. (*Id.* at 39.) Dr. McCutcheon testified that she has no reason to believe she did not ask her routine questions at petitioner's September 21, 2016, and that she believes if petitioner had reported shoulder pain at that appointment, she would have recorded it. (*Id.* at 39-40.)

With regard to petitioner's November 30, 2016 appointment, Dr. McCutcheon testified that she has no reason to believe the record of this encounter is not complete and accurate. (*Id.* at 50.) Dr. McCutcheon indicates that petitioner told her at that visit that her left shoulder pain had started "a couple weeks prior to [--] after she had received a flu shot on September of 2016." (*Id.* at 25.) Petitioner's counsel further probed whether Dr. McCutcheon believed the onset could have been misreported. Dr. McCutcheon responded: "I don't think so. I can tell you what I [am] reading from my notes is that she had a problem with bursitis with her shoulder but in her mind there was some connection between that and the flu shot but I found no evidence of that." (*Id.* at 30.)

Significantly, Dr. McCutcheon testified that she is "absolutely" aware that a flu shot can cause bursitis. (*Id.* at 30.) However, Dr. McCutcheon felt the timeline petitioner described – "a couple of weeks after receiving the flu shot" - was not consistent with her

---

[8] Asked specifically if she had ever misrecorded anything in her records, Dr. McCutcheon testified "I don't think I have." (*Id.* at 14.) During follow up questioning, petitioner's counsel adopted a tone of incredulity, ultimately asking Dr. McCutcheon "[s]o in 25 years when you're recording a patient's medical history and their complaints to you you're recording it with 100 percent accuracy? Is that what you're telling me?" (*Id.* at 14-15.) Dr. McCutcheon's consistent answer was that apart from the two or three instances she had previously referenced, she was not aware of having made such mistakes. (*Id.* at 14-15.) This is not the same as asserting 100% accuracy. Dr. McCutcheon acknowledged that she "is not perfect" and that mistakes are possible. (*Id.* at 26.) On the whole Dr. McCutcheon was a credible witness insofar as she is disinterested in the outcome of this case and limited her testimony to what she could recall or what she could ascertain from her records. (*E.g. Id.* at 20.) Notably, however, discussing her own errors in her medical records is likely a more sensitive topic for a physician and Dr. McCutcheon's disinterest does not necessarily extend to questions regarding her own fallibility. Nonetheless, she has no apparent motive to either favor or defeat petitioner's claim.

8

vaccine being the cause. (*Id*. at 30.) Asked if the specific notation regarding onset was mistaken, Dr. McCutcheon agreed that "I'm not perfect, so, of course, that's possible," but was clear in testifying that she did not believe this notation was a mistake. (*Id*. at 31.) Dr. McCutcheon also confirmed that her examination indicated pain over the acromioclavicular joint but did not reveal any tenderness in the deltoid muscle. (*Id*. at 49-50.) X-rays ordered in connection with that encounter showed mild degenerative changes (*Id*.) These factors contributed to her diagnosis of osteoarthritis of the left shoulder. (*Id*.)

### III.   Standard of Adjudication

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 300aa-11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination). Petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim. § 300aa–13(a)(1)(A).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras,* 993 F.2d at 1528; *Doe v. Sec'y of Health & Human Servs*., 95 Fed.Cl. 598, 608 (2010) ( "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Human Servs*., 468 Fed.Appx. 952 (Fed. Cir. 2011) (non-precedential opinion). This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs*., No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs*., 26 Cl.Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant

symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl.Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).  However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed.Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (*quoting Murphy*, 23 Cl.Ct. at 733).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y Health & Human Servs.*, 110 Fed.Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

The specific issue of determining the onset of symptoms in a SIRVA case has arisen repeatedly. Important to that point, the Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside

10

such a period." §300aa-13(b)(2). However, consistent with petitioner's burden of proof overall, that finding must be supported by preponderant evidence. *Id*.

In that regard, prior decisions by myself and other Special Masters have found that postponing treatment for a limited number of months is not *per se* dispositive of whether onset of shoulder pain occurred within the specified time period for a SIRVA. Nor is the fact of an intervening medical appointment at which symptoms are not discussed. *See e.g.*, *Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); and *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019). For example, in *Williams v. Secretary of Health & Human Services*, I found that the petitioner had established onset within 48 hours even though he had delayed treatment for his shoulder injury by roughly three to five months and his records suggested he may not have discussed his shoulder pain at the first available opportunity. No. 17-1046V, 2020 WL 3579763, at *2 (Fed. Cl. Spec. Mstr. Apr. 1, 2020).

However, delays in seeking treatment and intervening appointments have contributed to findings against SIRVA claims when the contemporaneous medical records are inconsistent with petitioner's allegation of immediate post-vaccination onset rather than merely silent. *See e.g.*, *Small v. Sec'y of Health & Human Servs.*, No. 15-478V, 2019 WL 6463985, at *11-*12 (Fed. Cl. Spec. Mstr. Nov. 1, 2019); *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019). In fact, key medical records indicating an onset of shoulder pain inconsistent with petitioner's allegations can carry substantial weight. For example, in *Demitor*, petitioner first presented for treatment of her shoulder pain approximately six months after her vaccination and at that time completed a patient intake form that placed onset of her injury just one month prior. In later medical records, petitioner associated her injury to her vaccination, but neither these later records nor petitioner's testimony could overcome the weight of her initial treatment records.

### IV.   Discussion

In this case, petitioner's most contemporaneous medical records not only fail to explicitly support her allegation of immediate onset, they are inconsistent with her claim. Contrary to the allegation in the petition, on November 30, 2016, when petitioner first sought treatment for her shoulder pain, Dr. McCutcheon recorded by petitioner's account that "left shoulder started hurting a couple weeks after she received the flu shot on 9/16/16." (Ex. 2, p. 18.) Consistent with that report, on September 21, 2016, approximately five days after her influenza vaccination, petitioner had reported to Dr. McCutcheon for a regular six month follow up and did not report any shoulder pain. (*Id*. at 20-22.) At that time musculoskeletal exam focused only on her knees. (*Id*. at 21.) Upon referral to an orthopedist on December 14, 2016, petitioner reportedly indicated that her shoulder pain was of "gradual" onset and did not associate the pain to her vaccination. (Ex. 3, p. 2.) It was only about one year later, on November 24, 2017, that petitioner filled out a questionnaire for a physical therapy evaluation and described her shoulder pain as beginning on the date of vaccination. (Ex. 4, p. 6.) Accordingly, the

11

most contemporaneous medical records from multiple providers reflect, without contradiction, a gradual onset of left shoulder pain occurring about two weeks after petitioner's September 16, 2016 flu vaccination.

Notably, the affidavits petitioner has filed also confirm key aspects of the history reflected in the medical records. Petitioner acknowledges in her own affidavit that she did not report any shoulder pain at her September 21, 2016 encounter with Dr. McCutcheon occurring five days post-vaccination. (Ex. 10, p. 2.) Additionally, the statements by petitioner and the three witnesses also confirm on the whole that petitioner did not mention any shoulder pain to anyone else until at least one week after her vaccination. (Exs. 9, 11, 13.) Moreover, none of the three witness statements specifically confirm an immediate onset of overall shoulder pain, though both Ms. Ellis and Ms. Palmer suggested the injection itself may have been painful. (*Id*.) (Petitioner likewise distinguishes between localized injection site pain, which she suggests was immediate, and overall shoulder pain, which she describes as developing "a few days later." (Ex.10, p. 2.)) Further, although she could not recall using the term at the time, petitioner confirms by the description in her affidavit that she experienced a "gradual" worsening of her pain, consistent with her initial orthopedic record.[9] (Ex. 10, p. 3.)

Turning to the key November 30, 2016 record, petitioner has entirely failed to establish any basis for doubting the accuracy of that record based on the affidavit testimony, the record itself, or Dr. McCutcheon's testimony. Importantly, this is informed by several factors and is not limited simply to Dr. McCutcheon's denial of having made any mistake. First, there is no pattern of error or omission facially evident in Dr. McCutcheon's records generally or the November 30, 2016 record particularly. (Ex. 2, pp. 18-19) In fact, the two-week post vaccination onset recorded by Dr. McCutcheon is corroborated by the radiology report of the same date that similarly estimates a two-month duration of symptoms. (Ex. 2, p. 43.) These two separate notations are consistent in their placement of onset. Relatedly, Dr. McCutcheon's testimony also reveals that her routine practice is consistent with accurate note taking. In particular, she explained that her habit and practice is to record her notes immediately and this is verified by the time stamp on the records themselves. (Ex. 14, pp. 10, 47-48, 51-52.) She also specifically testified that she rechecks her notes prior to closing each chart. (*Id*. at 26.)

Moreover, Dr. McCutcheon's records and testimony demonstrate that she was not a mere stenographer. Rather, she testified that she considered petitioner's belief that her vaccine was the cause of her shoulder pain and reached a reasoned judgment that petitioner's condition was not vaccine-related based on the history provided by petitioner, her own physical exam, and x-ray imaging. (*Id*. at 30, 49-50.) Also significant, petitioner's basis for assigning error to Dr. McCutcheon's record is her belief

---

[9] Specifically, petitioner indicated that "[t]he pain started at the injection site when I was vaccinated, it continued and worsened and I could feel pain in the whole left shoulder area a few days later, maybe over 3 days and it continued to increase. The onset was not gradual, it was sudden and started immediately when I was vaccinated, but *the pain increased and worsened gradually over time* – mostly over the first 3 to 6 days." (Ex. 10, p. 3 (emphasis added).)

12

that Dr. McCutcheon did not accept that it is possible for vaccines to cause bursitis generally (Ex. 10, p. 2); however, that belief is refuted by Dr. McCutcheon's testimony. Dr. McCutcheon confirmed that she is of the opinion that vaccines can cause bursitis. (Ex. 14, p. 30.) To the extent there is a credibility determination to be made, Dr. McCutcheon is a disinterested witness on the whole (*see* n. 8, *supra*) and her testimony is supported by contemporaneous documentation.

Petitioner argues that Dr. McCutcheon's November 30, 2016 notation of a two-week post vaccination onset is effectively an outlier "corroborated by nothing else in the record." (ECF No. 34, p. 5.) Further, petitioner relies on *Gentile v. Secretary of Health and Human Services* for the proposition that petitioner testimony in harmony with medical record evidence is sufficient to find an immediate onset. (*Id*. at 3-4 (citing No. 16-908V, 2018 WL 6540025 (Fed. Cl. Spec. Mstr. Oct. 29, 2018).) These arguments are without merit. In *Gentile,* the petitioner consistently reported to her physicians that her injury began at the time of her vaccination and the sole issue was her delay in seeking treatment. 2018 WL 6540025, at *5-7. Here, petitioner's initial treatment records reflect a later onset than she alleges. Petitioner stresses that the physical therapy intake form she completed corroborates an immediate onset (Ex. 4, p. 6); however, that record is a full year removed from her initial treatment and deserving of less weight given that it conflicts with the earlier medical records. *See, e.g. Vergara v. Sec'y of Health & Human Servs.*, 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recorded in later medical histories*, affidavits, or trial testimony"(emphasis added).). Moreover, contrary to petitioner's assertion, the specific notation at issue is corroborated by Dr. McCutcheon's testimony as well as the other contemporaneous treatment records, including petitioner's September 21, 2016 appointment, the radiologist's report, and Dr. Blair's records, all of which, though they do not repeat the exact notation, are consistent with that notation.[10]

Petitioner also argues that her allegation of immediate onset is corroborated by the affidavit of Ms. Phipps. (ECF No. 34, p. 5.) This too is not entirely correct. Ms. Phipps could not recall with specificity when she spoke with petitioner about her shoulder pain and did not reference any immediate post-vaccination onset. (Ex. 9.) Moreover, to the extent Ms. Phipps indicated this discussion occurred a "few days" after the vaccination, it is contradicted by petitioner's own account. Petitioner averred that she did not speak to anyone about her shoulder pain until at least one-week post-

---

[10] In the interest of completeness, I note that there are two later references to the duration of petitioner's shoulder pain in the medical records that are inconsistent with the onset recorded by Dr. McCutcheon. Specifically, on March 9, 2017, petitioner's shoulder pain was noted to have been present for over six months. (Ex. 3, p. 6.) On November 24, 2017, petitioner's pain was noted to have been present for one year. (Ex. 4, p. 11.) Upon my review, these notations do not appear to suggest any degree of precision and do not add significantly to the analysis. Importantly, however, if accepted as accurate these notations would likewise be inconsistent with petitioner's allegation of immediate post-vaccination shoulder pain. The former places onset prior to vaccination while the latter places onset two months after vaccination. That the medical records contain further inconsistency in petitioner's report of onset would not enhance her claim.

13

vaccination. (Ex. 10, p. 2.) Additionally, Ms. Ellis similarly averred that she first spoke with petitioner about her shoulder pain one-week post-vaccination despite seeing her 3-4 times per week during the relevant period. (Ex. 13.) Moreover, the affidavits focus on when petitioner spoke about her shoulder pain rather than whether the pain was immediate. At best, the witness affidavits can be harmonized to support the presence of shoulder pain occurring one-week post-vaccination, earlier than what was recorded by Dr. McCutcheon, but still not confirmation of the alleged immediate onset. In short, the recollections contained in these affidavits are not "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3. Even without questioning the truthfulness of these witness recollections, it remains the case that petitioner's report to Dr. McCutcheon of a two-week onset, which I find little to no reason to doubt was accurately recorded, remains the freshest available recollection of the onset of petitioner's shoulder pain and for all the reasons discussed above remains the most reliable account.

Finally, I do give some weight to petitioner's explanation for why she may not have been inclined to report shoulder pain during the week following her vaccination, i.e. that patients are routinely told that some post-vaccination pain is to be expected. In that regard, the fact that petitioner did not report shoulder pain at her September 21, 2016 medical appointment would not standing alone be likely to defeat her claim. However, the fact that the September 21 record is silent on the matter is not the sole or even primary issue in this case. When viewed as a whole, the contemporaneous medical records, including the September 21 record, weigh against petitioner's narrative.

## V.     Conclusion

In light of the above, there is not preponderant evidence that petitioner experienced left shoulder pain within 48 hours of her September 16, 2016 flu vaccination. Rather, the evidence preponderates in favor of a finding that petitioner experienced a gradual onset of left shoulder pain beginning at the earliest two weeks after her September 16, 2016 flu vaccination.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u><br>
Daniel T. Horner<br>
Special Master